**FIRST DIVISION**
**JUNE 09, 2008**

No. 1-07-0960; 1-07-1003 (Cons.)


| | | |
|---|---|---|
| THE CHICAGO PROVINCE OF THE SOCIETY OF JESUS, and FIRST NONPROFIT INSURANCE COMPANY a/s/o The Chicago Province of the Society of Jesus, | ) ) ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) | Nos. 04 L 4708 & 04 L 10237 |
| CLARK AND DICKENS, L.L.C., NEW CHICAGO PARTNERS, L.L.C., HENEGHAN WRECKING CO., HARD ROCK CONCRETE CUTTERS, INC., ILLINOIS DRILLING AND TESTING COMPANY, and KEVIN SALMON, | ) ) ) ) ) ) ) | |
| Defendants-Appellees | ) ) | |
| Pioneer Concrete Raising Services, Inc., Quality Excavation, Inc., and West Suburban Concrete Company; | ) ) ) ) ) | Honorable Brigid Mary McGrath, Judge Presiding. |
| Defendants-Appellants; | ) ) | |
| Foundation Engineering, Inc., Robert L. Miller and Associates, and Chatain and Company, | ) ) ) ) | |
| Defendants. | ) | |

No. 1-07-0960; 1-07-1003 (Cons.)

JUSTICE ROBERT E. GORDON delivered the opinion of the court:

Plaintiff Chicago Province of the Society of Jesus (Jesuits) owned a building in Chicago's Lincoln Park neighborhood that collapsed, following the demolition of the building next door. Plaintiff First Nonprofit Insurance Company (First Nonprofit) had insured the Jesuit building and paid plaintiff Jesuits close to $2 million for their insurance claim. Plaintiffs Jesuits and First NonProfit then sued 12 defendants, including the owner of the property next door, as well as the contractor and subcontractors, for demolition and other damages. Six of the twelve defendants chose to settle.

Plaintiffs and the settling defendants filed a joint motion for a finding by the trial court that the settlement was in good faith, and three nonsettling defendants objected. The three objecting defendants were appellants Pioneer Concrete Raising Services, Inc. (Pioneer), Quality Excavation, Inc. (Quality), and West Surburban Concrete Company (West Surburban). In an order dated February 26, 2007, the trial court found the settlement agreement to be in good faith, and the three objecting defendants appealed. For the reasons discussed below, we affirm.

BACKGROUND

The Parties

Plaintiff Jesuits owned the land and building at 2058 North Clark Street (the Jesuit building). Plaintiff First Nonprofit had insured the Jesuit building and paid $1,826, 275 to plaintiff Jesuits for their insurance claim after the Jesuit building's partial collapse and subsequent demolition.

Defendant Clark and Dickens, L.L.C. (C&D), owned the building next door, 2060 North

2

Clark Street, that was demolished to make way for a new building. C&D was not only the owner but also the general contractor for the new, proposed building at 2060 North Clark. Defendant New Chicago Partners, L.L.C. (NCP), was the managing partner of C&D and filed with the City of Chicago for permission to build a four-story building on the site at 2060 North Clark Street. In an agreement dated July 12, 2002, defendants C&D and NCP agreed to indemnify plaintiff Jesuits for any damages or attorney fees arising out of the demolition and construction project at 2060 North Clark Street.

The appellees consist of the two plaintiffs and the six settling defendants. The six settling defendants were: C&D, NCP, Kevin Salmon, Hard Rock Concrete Cutters, Inc. (Hard Rock), Heneghan Wrecking Co. (Henegahan Wrecking) and Illinois Drilling & Testing Co. (Illinois Drilling). Defendant Salmon was hired by defendants C&D and NCP to supervise the demolition and construction project. Defendant Hard Rock was hired by defendants C&D and NCP to perform concrete cutting and concrete removal at the construction site. Defendant Heneghan Wrecking Co. (Heneghan Wrecking) performed the demolition and removal of the existing building. Defendant Illinois Drilling conducted soil testing at the construction site.

The appellants are the three objecting and nonsettling defendants: (1) Pioneer, (2) Quality and (3) West Suburban. The appellees claim that these three defendants are the most culpable of the subcontractors. The appellees allege that: (1) defendant Pioneer installed the "micropiles" that were designed to protect the Jesuit building but failed; (2) defendant Quality installed a "dead man system" that was also designed to protect the Jesuit building but instead its installation caused the deterioration of lateral and subadjacent support for the foundation of the

3

Jesuit building; and (3) defendant West Suburban dug in and around the foundation of the Jesuit building.

Plaintiffs sued three entities that are not part of this appeal. Two defendants did not settle but also did not object to the settlement at issue : (1) Robert L. Miller Associates, the structural engineers for the project; and (2) Foundation Engineering, Inc, which also performed engineering work. Since they did not object, they are not part of the appeal. Plaintiff also sued defendant Chatain & Co. (Chatain), which was subsequently dismissed without prejudice. Thus, this appeal does not involve these three defendants.

The Collapse

During the demolition of the building at 2060 North Clark Street, defendant Heneghan Wrecking discovered that a foundation wall of 2060 North Clark had been bonded to the adjacent brick foundation wall of the Jesuit building. On January 13, 2003, defendant NCP sent a letter to plaintiff Jesuits detailing the discovery of the bonded wall and explaining defendant NCP's decision not to remove the bonded wall and to have the Jesuit building structurally underpinned. After learning about the bonded wall, defendants C&D and NCP hired additional subcontractors, including all three appellants, to perform additional work to stabilize the foundation and perform other preparation for the new building.

At the end of April 2003, the Jesuit building suffered major structural damage and partial collapse. On April 27, 2003, by order of the City of Chicago, the remaining structure was demolished. Ian Chin, an engineer hired by the Jesuits to investigate the collapse, stated in an affidavit that the collapse of the Jesuit building was due to the "excavation activities" from the

construction project next door. Plaintiff First Nonprofit alleges that, on July 30, 2003, plaintiff Jesuits submitted a proof of loss in the amount of $1,826,275, and plaintiff First National paid that sum to plaintiff Jesuits.

Complaints

Plaintiff Jesuits filed suit on April 26, 2004. Their first amended complaint, filed on February 10, 2006, contained 7 counts against 11 defendants. Counts 1 and 2 alleged that defendants C&D and NCP breached their July 12, 2002, agreement to indemnify plaintiff Jesuits for any damages and attorney fees arising out of the demolition and construction project. Count 3 alleged that all 11 defendants violated the Adjacent Landowner's Excavation Protection Act (765 ILCS 140 10.01 et seq. (West 2002)). Counts 4, 5 and 6 alleged negligence by all 11 defendants. Count 7 alleged that all 11 defendants violated the Illinois Municipal Code (65 ILCS 5/11-13-15 (West 2002)) and the Chicago Municipal Code. Plaintiff Jesuits alleged that the collapse of the Jesuit building resulted in uninsured damages of $1,086, 073, in addition to ongoing attorney fees.        Plaintiff First Nonprofit filed suit on September 9, 2004. Its amended complaint, filed on May 25, 2005, contained 5 counts against 12 defendants. In addition to the 11 defendants sued by plaintiff Jesuits, plaintiff First Nonprofit also sued defendant Chatain, which it alleged was "the MEP engineers" for the construction project. On December 5, 2005, defendant Chatain was dismissed without prejudice.

Count 1 of First Nonprofit's amended complaint alleged that all 12 defendants violated the Adjacent Landowner's Excavation Protection Act (765 ILCS 140 10.01 et seq (West 2002)). Counts 2, 3 and 4 alleged negligence by all 12 defendants. Count 5 alleged that all 12

5

defendants failed to comply with the Illinois Municipal Code (65 ILCS 5/11-13-15 (West 2002)) and the Chicago Municipal Code.   Plaintiff First Nonprofit sought the $1,826, 275 that it had paid to plaintiff Jesuits, as well as costs.

Besides costs and attorney fees, the damages sought by both plaintiffs totaled $2, 912, 348, or close to $3 million. [1]

Settlement Agreement and Good-Faith Finding

On June 27, 2006, plaintiffs filed a "Joint Motion for Leave to Report to the Court on Status of the Settlement Negotiations and to Set a Discovery Schedule."   In the motion, plaintiffs stated that all parties had retained a mediator in an attempt to reach a global settlement. Although the record on appeal contains no transcript of the proceedings on June 27, 2006, appellees allege in their brief to this court that the trial court held a hearing on that day.  The order issued by the trial court on June 27 is part of the appellate record, and it ordered: (1) all written discovery to be propounded by July 25, 2006; (2) all counterclaims to be filed by July 10, 2006; (3) the motion for a good-faith finding to be filed by July 7, 2006; and (4) a case management conference to be held on July 26, 2006..

In July 2006, plaintiffs and the six settling defendants executed a written settlement agreement that "reflect[ed] the terms of the settlement reached between the Parties hereto on or

---

[1] Appellee's joint motion for a good-faith finding stated that plaintiff's total damages were approximately $2.8 million. However, the damages claimed in the two complaints add up to more.

about May 26, 2006." Plaintiffs agreed to release the six settling defendants from all claims in connection with the collapse and demolition of the Jesuit building, in return for the payment of $1,185, 000. The agreement allocated $100,000 for the payment of plaintiffs' attorney fees.

On July 14, 2006, plaintiffs and settling defendants (appellees) filed a joint motion for a good-faith finding, asking the trial court to find that the settlement agreement was entered in good faith. Although the record on appeal contains no transcript of the proceedings on July 26, 2006, both sides to this appeal represent in their briefs to this court that the trial court did hold a case management conference on that day. Also, appellant Pioneer described the July 26 proceeding in a motion it subsequently filed on September 27, 2006. Appellant Pioneer stated that on July 26, the appellants informed the court that, in order to respond to the good-faith motion, they needed appellees' answers to written discovery requests.

In a written order dated July 26, the trial court ordered: (1) all parties to answer outstanding written discovery by August 9, 2006; (2) all parties objecting to the settlement to file a response by September 6, 2006; (3) plaintiffs and settling defendants to reply by September 18, 2006; and (4) argument on the motion, to be held on September 25, 2006.

On September 21, 2006, appellant Quality filed a motion to extend its time to object to the settlement. Although the appellate record contains no transcript of the proceedings, appellants in their brief to this court represent that "the trial court held a hearing" on that day concerning the extension motion. The written order issued on September 21 by the trial court granted the extension motion, thereby permitting appellants an additional 21 days, or until October 12, 2006, to file their objections.

Less than a week later, on September 27, 2006, appellant Pioneer filed an "Emergency Motion to Compel Outstanding Written Discovery," in which it stated that it needed the discovery in order to respond to the good-faith motion. Again, although the record on appeal contains no transcript of the proceedings held on September 28, both sides represent in their briefs to this court that "a hearing" was held on that day. On September 28, the trial court issued a written order that granted the motion, set due dates for certain discovery, vacated the prior briefing schedule and set the case for status on October 16, 2006.

On October 16, 2006, a status hearing was held. Again, the appellate record does not contain a transcript for this proceeding, but both sides in their briefs to this court represent that a hearing was held. In a written order dated October 16, the trial court directed certain discovery responses and ordered appellants to file their objections by November 20.

On November 20, 2006, appellants filed their objections to the good-faith motion. One of the objections was that the settlement agreement failed to allocate the settlement amount between the two plaintiffs or among their causes of action. On December 11, 2006, appellees filed a joint reply.

On January 18, 2007, in a written order, the trial court ordered the settling parties to submit a proposed apportionment of the settlement proceeds, as between the two plaintiffs and among the various causes of action. The appellate record contains no transcript of a proceeding on January 18. In their briefs to this court, appellees claim that a hearing took place, while appellants claim it was not a hearing on the good-faith motion.

On January 29, 2007, appellees submitted a proposed apportionment; on February 7,

8

2007, appellants filed a reply to the proposed apportionment; and on February 20, 2007, appellees filed a surreply.

On February 26, 2007, the trial court granted the motion for a good-faith finding. This transcript is part of the appellate record. No oral argument was heard on February 26 concerning the motion. After the attorneys introduced themselves for the record, plaintiff Jesuits' attorney stated: "Judge, this has been before you several times. I think it is now fully briefed. And we're ready to receive your ruling or answer any questions you may have." After plaintiff Jesuits' attorney spoke, the trial court immediately issued its ruling. The trial court first agreed with counsel's observation that this motion had already been before the trial court "several times." The trial court then found that the settlement agreement was in good-faith, and dismissed with prejudice the claims and counterclaims against the settling defendants. None of the attorneys objected to the lack of oral argument prior to the trial court's ruling.

Although the February 26 order did not terminate the litigation as to all parties, the trial court subsequently made a finding pursuant to Supreme Court Rule 304(a) that there was no just reason to delay appeal of the February 26 order. 210 Ill. 2d R. 304(a). This appeal followed.

ANALYSIS

At issue on this appeal is the good-faith finding made by the trial court. The good-faith finding was made pursuant to the Illinois Joint Tortfeasor Contribution Act (740 ILCS 100/2 (West 2006)) (Contribution Act). The Contribution Act provides that a torfeasor who settles with a claimant "in good-faith" is "discharged from all liability for any contribution to any other tortfeasor." 740 ILCS 100/2(c), (d) (West 2006). With respect to the Contribution Act, our

No. 1-07-0960; 1-07-1003 (Cons.)

supreme court has held: "The 'good-faith' of a settlement is the only limitation which the Act places on the right to settle and it is the good faith nature of a settlement that extinguishes the contribution liability of the settling tortfeasor." Johnson v. United Airlines, 203 Ill. 2d 121, 128 (2003); Pierre Condominium Ass'n v. Lincoln Park West Associates, LLC., 378 Ill. App. 3d 770, 778 (2007).

### Standard of Review

An appellate court will reverse a trial court's good-faith determination only if the trial court abused its discretion. Johnson, 203 Ill. 2d at 135; Pierre, 378 Ill. App. 3d at 779. An abuse of discretion occurs only "where no reasonable person would take the view adopted by the trial court." Gridley v. State Farm Mutual Automobile Insurance Co., 217 Ill. 2d 158, 169 (2005). Thus a reviewing court's starting point is the view voiced by the trial court. Pierre, 378 Ill. App. 3d at 780 (in holding that the trial court did not abuse its discretion when making a good-faith finding, this court quoted and discussed the view voiced by the trial court).

### Incomplete Record

In the case at bar, we have no idea what view the trial court voiced because the appellate record is missing numerous transcripts where the trial court may have voiced its view. At least half a dozen hearings took place concerning the good-faith motion prior to the trial court's ruling on February 26, 2007. There were hearings on June 27, 2006; July 26, 2006; September 21, 2006; September 28, 2006; October 16, 2006; and January 18, 2007. Instead of providing the transcripts in the record, appellants chose to spend several pages of their brief arguing to this court what the missing transcripts might have "possibly" said. This type of speculation has been

10

explicitly forbidden by our supreme court. The Illinois Supreme Court has held that a reviewing court may not look beyond the appellate record to "speculate on what may have occurred in the trial court." Webster v. Hartman, 195 Ill. 2d 426, 436 (2001).

To excuse their failure to include the transcripts in the record, appellants claimed on appeal that there was "no reason to believe" that the missing transcripts contained "any arguments of substance on the good-faith motion." That "reason" is found in the transcript of February 26, the day on which the trial court issued its finding and one of the few transcripts provided in the record. The transcript shows that the attorneys offered no argument concerning the motion on that day. Instead, the trial court observed that the matter had already been before it "several times" and proceeded immediately to issue its ruling. No attorney objected to the lack of argument. The one attorney who spoke prior to the ruling merely stated "we're ready to receive your ruling." The February 26 transcript thus provides a "reason to believe" that the missing transcripts contained arguments concerning the good-faith motion. People v. Probst, 344 Ill. App. 3d 378, 385 (2003) (where appellant's failure to include a transcript leaves a reviewing court "unable to scrutinize the reasoning of the trial court," the reviewing court must affirm).

Appellants also argue on appeal that if appellees believed that the missing transcripts were important, then appellees would have moved to supplement the record. Our supreme court has rejected that argument, too. The Illinois Supreme Court has held that an appellee bears no burden to ensure that the record filed in the reviewing court is complete. Webster, 195 Ill. 2d at 436. That is "always the appellant's burden." Webster, 195 Ill. 2d at 436.

" 'The law is well settled that appellants bear the duty to "present a record *** which

11

fairly and fully presents all matters necessary and material for a decision of the question raised." ' " (Ellipses in original) <u>Emery v. Northeast Illinois Regional Transportation Co.</u>, 374 Ill. App. 3d 974, 979 (2007) quoting <u>Smolinski v. Vojta</u> 363 Ill. App. 3d 752, 757 (2006), quoting <u>LaPlaca v. Gilbert & Wolf, Inc.</u>, 37 Ill. App. 3d 259, 260-61 (1976); <u>Webster</u>, 195 Ill. 2d at 432. In the case before us, appellants have failed in their duty to present a full and fair record. <u>Emery</u>, 374 Ill. App. 3d at 979 (" 'In the absence of such a record, we will not speculate as to what errors may have occurred below.' "), quoting <u>Smolinski</u>, 363 Ill. App. 3d at 757; <u>People v. Edwards</u>, 74 Ill. 2d 1, 7 (1978) (when a record is incomplete, a reviewing court "may not guess *** or hypothesize"). We could affirm on this basis alone. However, we will review appellants' substantive arguments.

Good-faith Finding

In a proceeding to determine the good-faith of a settlement, the burden of proof first rests with the settling parties, who must make a preliminary showing of good-faith. <u>Johnson</u>, 203 Ill. 2d at 132; <u>Pierre</u>, 378 Ill. App. 3d at 779. At a bare minimum, the settling parties must submit a legally valid settlement agreement. <u>Johnson</u>, 203 Ill. 2d at 132. However, not all legally valid settlement agreements will suffice. <u>Johnson</u>, 203 Ill. 2d at 132. The court must find that the agreement is reasonable, in light of the goals of the Contribution Act. <u>Johnson</u>, 203 Ill. 2d at 132; <u>Pierre</u>, 378 Ill. App. 3d at 779. Our supreme court has repeatedly stated that the Act's goals are to encourage both: (1) settlements; and (2) equitable apportionment of damages among tortfeasors. <u>BHI Corp. v. Litgen Concrete Cutting & Coring Co.</u>, 214 Ill. 2d 356, 365 (2005); <u>Johnson</u>, 203 Ill. 2d at 133; <u>Pierre</u>, 378 Ill. App. 3d at 779. An agreement is reasonable if it

"strike[s] a balance" between these two goals. Johnson, 203 Ill. 2d at 133. To determine whether an agreement is reasonable, a court may require factual evidence, in addition to the settlement agreement itself. Johnson, 203 Ill. 2d at 133.

Once the settling parties have made a preliminary showing of good-faith, the burden of proof then switches to those parties opposing the settlement, to prove an absence of good-faith by a preponderance of the evidence. Johnson, 203 Ill. 2d at 132; Pierre, 378 Ill. App. 3d at 779. "Good-faith" is not defined by the Contribution Act. Johnson, 203 Ill. 2d at 134. Our supreme court has held that a settlement agreement is not in "good-faith" if: (1) the settling parties engaged in wrongful conduct, collusion or fraud; or (2) if the settlement conflicts with the terms or goals of the Act. Johnson, 203 Ill. 2d at 134-35; Pierre, 378 Ill. App. 3d at 779. However, our supreme court has also explained that there is no "single precise formula" for determining good-faith, and good-faith must be determined from "the totality of the circumstances." Johnson, 203 Ill. 2d at 134-35; Pierre, 378 Ill. App. 3d at 778.

In the case at bar, appellants claim that the trial court abused its discretion by finding good-faith, because: (1) the settling parties failed in their initial burden of showing good-faith; and (2) even if the settling parties did make a preliminary showing of good-faith, appellants satisfied their burden of proving a lack of good-faith by a preponderance of the evidence.

Initial Burden

Appellants claim that the settling parties failed in their initial burden, because "the trial court did not have sufficient information from which it could have determined the parties' relative culpability." In essence, appellants challenge the settlement based only on the act's

second goal of equitable apportionment. Johnson, 203 Ill. 2d at 132-33; Pierre, 378 Ill. App. 3d at 779. They do not raise any claims of wrongful conduct, collusion or fraud or challenge in any way the legal validity of the agreement. Johnson, 203 Ill. 2d at 134; Pierre, 378 Ill. App. 3d at 779.

A "preliminary showing" is a low threshold. It is certainly less than a preponderance, because once the settling parties have made a "preliminary showing," the burden then shifts to the opposing parties to disprove it by the higher preponderance standard. Johnson, 203 Ill. 2d at 132; Pierre, 378 Ill. App. 3d at 779. Even when the burden shifts and the trial court must rule by the higher preponderance standard, the trial court is not required to hold an evidentiary hearing. Johnson, 203 Ill. 2d at 139. The trial court also is not required to decide the relative liabilities of the parties or the merits of the case, before making a good-faith finding. Johnson, 203 Ill. 2d at 139.

In Johnson, our supreme court "agree[d] with the trial court that the settling parties provided a sufficient preliminary showing of good-faith" (Johnson, 203 Ill. 2d at 140) and the trial court had found that "the representations made by the settling parties" constituted a preliminary showing. Johnson, 203 Ill. 2d at 135. Defense counsel represented to the trial court that defendant believed itself immune from liability but settled to avoid the time and expense of additional litigation. Johnson, 203 Ill. 2d at 135. Plaintiffs' counsel represented to the trial court that plaintiff believed that the likelihood of success against the settling defendant was marginal. Johnson, 203 Ill. 2d at 135. These representations sufficed for a preliminary showing.

In Johnson, our supreme court rejected appellant's claim that the trial court had to

14

conduct an evidentiary hearing, noting that the trial court had invited the parties to submit any additional materials and that the trial court had before it: (1) the parties' pleadings; (2) the parties' memoranda and other filings; and (3) argument from counsel. Johnson, 203 Ill. 2d at 136. By contrast, in Cianci v. Safeco Insurance Co., 356, Ill. App. 3d 767 (2005) this court found that the trial court had insufficient information when it lacked: (1) some of the pleadings; and (2) an allocation of the settlement amounts among plaintiffs' theories of recovery. Cianci, 356 Ill. App. 3d at 782-83 (good-faith finding was "premature"). In Cianci, we distinguished Johnson, by noting that the record in Cianci lacked answers from two of the three defendants and contained no justification for the settlement amounts. Cianci, 356 Ill. App. 3d at 784.

In the case at bar, we find that the settling parties met their initial burden. The trial court had before it: (1) a legally valid settlement agreement, with charts allocating the settlement amounts among both the settling defendants and plaintiffs' theories of recovery; (2) the pleadings;[2] (3) the parties' memoranda; (3) representations by counsel that appellants were more culpable than the settling defendants;[3] (4) no allegations of wrongful conduct, collusion or fraud; and (4) last, but not least, discovery specifically requested by appellants in order to respond to the

---

[2]Even though the record does not appear to contain answers from all the defendants, appellants stated in their objection to the good-faith motion that "this litigation" had "advanced beyond the pleading stage." This statement indicates that pleadings had been filed.

[3]In plaintiffs' joint motion for leave to report to the trial court on the status of settlement negotiations, plaintiffs stated that appellants were "the most culpable" and explained why.

No. 1-07-0960; 1-07-1003 (Cons.)

good-faith motion.

Preponderance

Once the settling parties made a preliminary showing, the burden shifted to the appellants to prove a lack of good-faith by a preponderance of the evidence. Johnson, 203 Ill. 2d at 132; Pierre, 378 Ill. App. 3d at 779. On appeal, appellants claim a lack of good-faith because: (1) the settlement was for less than half of plaintiffs' claimed damages; and (2) settling defendants C&D and NCP had a contractual obligation to indemnify plaintiff Jesuits for damages arising out of the demolition, excavation and construction.

Less Than Half of Claimed Damages

Plaintiffs claimed total damages of $2,912,3418, or close to $3 million. The settlement amounts were apportioned among the six settling defendants as follows:

| Defendant | Role | Amount | % of Damages |
|---|---|---|---|
| 1. C&D | owner | $ 504, 000 | 17.3% |
| 2. NCP | general partner | $ 259, 000 | 8.8% |
| 3. Salmon | construction mgr. | $ 222, 000 | 7.6% |
| 4. Heneghan | demolition | $ 100, 000 | 3.4% |
| 5. Hard Rock | concrete cutting | $ 75, 000 | 2.5 |
| 6. Illinois Drilling | soil testing | $ 25, 000 | 0.8 |
| Total | | $1, 185, 000 | 40.4% |

The settlement leaves the remaining five defendants potentially liable for $1,727,348, or 59.6% of the claimed damages. The remaining five defendants are the three appellants, plus the two

non objecting, nonsettling defendants. The two non-objecting defendants are: Robert L. Miller Associates, the structural engineers for the project; and Foundation Engineering, Inc., which performed engineering work. [4] Releasing approximately half the defendants for slightly less than half of the claimed damages does not, by itself, show a lack of good-faith. Johnson, 203 Ill. 2d at 136-37 ("the disparity between the settlement amount and the ad damnum in the complaint is not an accurate measure of the good-faith of a settlement").

Appellants claim that the settlement amounts did not reflect the "relative culpability" of the defendants. Stickler v. American Augers, Inc., 303 Ill. App. 3d 689, 693 (1999) (defendants' "relative culpability" is a factor in evaluating the good-faith of a settlement). In response, appellees claimed that appellants are the most culpable subcontractors, and explained why. Appellees allege that: (1) defendant Pioneer installed the "micropiles" that were designed to protect the Jesuit building but failed; (2) defendant Quality installed a "dead man system" that was also designed to protect the Jesuit building but instead its installation caused the deterioration of lateral and sub adjacent support for the foundation of the Jesuit building; and (3) defendant West Suburban dug in and around the foundation of the Jesuit building.

In their briefs to this court and in their response to the good-faith motion, appellants have not offered any explanation of why they are not the most culpable. Appellants describe the roles

---

[4]This list does not include Chatain & Co., which designed the mechanical and electrical systems for the guilding. Chatain was sued only by plaintiff FirstNonprofit, and was dismissed without prejudice from FirstNonprofit's suit on December 5, 2005.

of the other defendants in the demolition and construction project but fail to describe their own roles. For example, in their response to the good-faith motion, appellants claimed their roles were "minor" but failed to specify what their roles were. If appellants are going to challenge the settlement as letting the more culpable defendants off the hook for minimal consideration, then as part of their preponderance burden, they have to, at a minimum, offer an explanation of what they did and why they are less culpable. Stickler, 303 Ill. App. 3d at 693 (objectors may prove bad faith by showing that settling defendants were released for "nominal consideration without regard to *** relative culpability").

In support of their claim that the "nominal consideration" in the settlement agreement renders it in bad faith, appellants cite this court's opinion in Stickler, 303 Ill. App. 3d at 693. In Stickler, we held that a trial court's good-faith finding was an abuse of discretion. Stickler, 303 Ill. App. 3d at 694. The Stickler plaintiff was statutorily entitled, for the rest of her life, to workers' compensation benefits from the decedent's employer. Stickler, 303 Ill. App. 3d at 693. The present value of these future benefits was over a million dollars. Stickler, 303 Ill. App. 3d at 693-94. The settlement agreement released the employer from this "undisputed" million dollar liability, for less than $300,000. Stickler, 303 Ill. App. 3d at 693-94. Holding that this agreement was not in good-faith, this court noted that the employer's liability was both "undisputed" and determined by the Workers' Compensation Act (820 ILCS 305/1 et seq. (West 2006)). Stickler, 303 Ill. App. 3d at 693, 695. We found that the Stickler case was very different from one in which "the settling defendants' financial liability and comparative fault were unknown." Stickler, 303 Ill. App. 3d at 695.

18

Thus, Stickler is readily distinguishable, because in the case at bar the settling defendants' financial liability and comparative fault are not fixed and will not be known until a trial on the merits.

Indemnification Contract

Appellants also claim that the settlement was not in good-faith because settling defendants C&D and NCP were contractually liable for all the damages to the Jesuit building. Appellants claim that defendants's contractual liability is analogous to the statutory liability of the defendant in Stickler, where this court held that settlement for a small fraction of an "undisputed" statutory liability was not in good-faith. Stickler, 303 Ill. App. 3d at 694.

In the case at bar, settling defendants C&D and NCP signed an agreement with plaintiff Jesuits prior to the accident. In paragraph 3 of that agreement, defendants C&D and NCP agreed "to indemnify and hold Neighbor [Jesuits] harmless from any and all liability, costs, damages and attorney's fees which in any way arise out of demolition or excavation or having to do with the construction."

However, paragraph 3 contained two exclusions. First, it excluded from indemnification "actions or occurrences in which Neighbor was actively responsible." Second, it excluded "actions in which Neighbor is made whole as an additional insured under paragraph 4."

In paragraph 4, defendants C&D and NCP agreed to require "all major contractors and subcontractors" to have "liability coverage" of not less than $5 million and to "make Neighbor an additional insured with respect to all property and liability insurance coverages which Owner [C&D and NCP] shall obtain with respect to said construction." Thus, the indemnification

liability of defendants C&D and NCP set forth in paragraph 3 is not as certain as the statutory liability of the defendant in Stickler. Stickler, 303 Ill. App. 3d at 694. The existence of this indemnification agreement did not turn the trial court's good-faith finding into an abuse of discretion.

CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed. The trial court's good-faith finding was not an abuse of discretion.

Affirmed.

CAHILL, P.J., and WOLFSON, J., concur.